# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DG BF, LLC, a Delaware limited liability company, individually and derivatively on behalf of AMERICAN GENERAL RESOURCES LLC, a Delaware limited liability company; and JEFF A. MENASHE, individually and derivatively on behalf of AMERICAN GENERAL RESOURCES LLC.

Plaintiffs,

v.

MICHAEL RAY, an individual, and VLADIMIR EFROS, an individual,

Defendants,

and

AMERICAN GENERAL RESOURCES, LLC, a Delaware limited liability company,

Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2020-0459-MTZ

## MEMORANDUM OPINION
Date Submitted:  November 12, 2020
Date Decided:  March 1, 2021

Sean J. Bellew, BELLEW LLP, Wilmington, Delaware; Gerard P. Fox and Marina V. Bogorad, GERARD FOX LAW P.C., Los Angeles, California; *Attorneys for Plaintiffs DG BF, LLC and Jeff A. Menashe.*

Sean A. Meluney and Matthew D. Beebe, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Wilmington, Delaware; *Attorneys for Defendants Michael Ray and Vladimir Efros.*

David B. Anthony, BERGER HARRIS LLP, Wilmington, Delaware; Perry J. Woodward, HOPKINS & CARLEY, A LAW CORPORATION, San Jose, California; *Attorneys for Nominal Defendant American General Resources, LLC.*

**ZURN, Vice Chancellor.**

The plaintiff in this case—the founder and CEO of an investment banking firm specializing in the wine and spirits industry—invested in a cannabis company. In advance of that investment, the plaintiff engaged in extensive negotiations with the individual defendants: the company's chief executive officer ("CEO") and chief strategy officer ("CSO"). During these negotiations, the CSO presented strong historical financial numbers and promising projections for future growth. He touted that he was currently negotiating, and would soon close, a lucrative merger with a successful cannabis distribution company. Ultimately, the plaintiff invested $5 million into the company and became the lead investor in its "Series D" financing round. In return for his investment, the plaintiff became the Series D representative on the company's board of managers, securing certain corporate governance rights and other preferences. His affiliated investment banking firm also secured a potentially profitable position as the company's investment banker.

Soon after the plaintiff invested, the rosy picture the defendants had painted began to fade. The lucrative merger deal vanished without explanation. Less than four months after the plaintiff invested, the company's chief financial officer ("CFO") pled guilty to creating fraudulent financial records and misleading investors in a $1 billion Ponzi scheme at another company. While the defendants allegedly knew the CFO was being investigated, they did not disclose that issue to the plaintiff before he invested. Moreover, the CFO was responsible for preparing the company's

1

historical financial records and projections that the defendants presented to the plaintiff to secure his investment. Once the plaintiff invested, the company's historic financial performance was revised downward and, with it, the company's projected future growth. Within months, the company was insolvent and pursuing more money in a new "Series E" financing round.

The plaintiff, along with his investment vehicle, initiated litigation by seeking to enjoin that new financing round. Allegedly in retaliation for his actions, and to remove an obstacle to the new financing round, the defendants rallied the Series D members to secretly remove plaintiff from the board. These actions inspired new claims in an amended complaint, which is the subject of the pending motion to dismiss.

The amended complaint spans one hundred forty-three pages and offers twenty-four counts, taking readers on a comprehensive tour of the realms of fiduciary duty, contract, and tort. The facts as pled support the investors' many claims with varying degrees of success. For the reasons described below, the motion to dismiss is granted in part, denied in part, and remains under advisement in part pending supplemental briefing.

## I.    BACKGROUND[1]

### A.    Plaintiffs Negotiate An Investment In American General Resources.

Nominal Defendant American General Resources LLC ("AGR" or the "Company") is a Delaware limited liability company.  Through a series of subsidiaries, AGR operates a business known as Bloom Farms, which is active in the cannabis and CBD industry.  AGR is a top ten cannabis brand in California. Defendants Michael Ray and Vladimir Efros (together, the "Individual Defendants") are both members and managers of AGR.  Ray is AGR's CEO and Efros is AGR's CSO.  They are also both involved in Bloom Farms, with Ray as the CEO and Efros as the CSO.

AGR set out to raise capital by selling preferred units in a Series D round. This opinion refers to that financing round as the "Series D Financing," and the investors in that round as the "Series D Unitholders."  In February 2019, Plaintiff Jeff Menashe entered negotiations with the Individual Defendants to lead the Series D Financing.  Menashe is the founder and CEO of Demeter Advisor Group, LLC ("Demeter Group"), an investment banking firm in the wine and spirits industry. The parties' negotiations became more serious by the spring of 2019.

---

[1] On this motion to dismiss, I draw all facts from the first amended complaint, available at Docket Item ("D.I.") 49 [hereinafter "FAC"], the documents it incorporates by reference, and relevant pre-suit communications. *See Solak ex rel. Ultragenyx Pharm. Inc. v. Welch*, 2019 WL 5588877, at *1 n.3 (Del. Ch. Oct. 30, 2019).

Menashe negotiated exclusively with Efros. Before Menashe invested, he and Efros discussed the Company's finances on at least two occasions. Menashe relied on the information Efros gave him when he ultimately decided to invest. On March 31, Efros presented Menashe with historical financial information about AGR's performance, and projected that AGR's annual net income would be $15,480,527. On June 1, Efros provided "corrected" historical information, and dropped AGR's projected annual net income to $7,187,884. Efros also projected that AGR would achieve positive cash flow within five months of Menashe's June 2019 investment, and told Menashe that the Company's 2020 revenue was projected to be between $62 million and $82 million. Based on these projections, Efros valued AGR at $100 million prior to the Series D Financing. The Series D Financing was to raise at least $15 million, and up to $25 million, at that valuation.

During the spring of 2019, Efros indicated that AGR would be receiving an infusion of cash from the imminent sale of AGR's distribution subsidiary. Specifically, Efros told Menashe that he was currently negotiating a three-way merger of AGR's distribution subsidiary that would net the Company at least $30 million in cash and about a forty percent interest in what was to be one of California's largest cannabis distribution companies. This opinion refers to this transaction as the "Distribution Merger." Efros indicated the Distribution Merger would close either before or immediately after the Series D Round's initial closing

4

in July 2019. Efros also repeatedly suggested that AGR was looking toward an initial public offering ("IPO") within a year at approximately a $300 million valuation. These representations also helped to persuade Menashe to invest.

### B. The Investment Closes And The Parties Execute The Operating Agreement.

After negotiations, Menashe ultimately invested in AGR through an entity he formed, Plaintiff DG BF, LLC ("DG BF," and together with Menashe, "Plaintiffs"). Menashe owns and controls DG BF, and serves as its managing member. In June 2019, DG BF invested $5 million in AGR (the "Investment"), becoming the lead investor in the Series D Financing and AGR's largest investor. The parties memorialized the Investment via the Series D Unit Purchase Agreement, dated June 20 (the "Purchase Agreement").[2]

The parties also executed two other pertinent agreements on June 20. The first is AGR's Sixth Amended and Restated Limited Liability Company Agreement (the "Operating Agreement").[3] A brief overview of that agreement puts the parties' relationship into context. The Operating Agreement established a five-member Board of Managers (the "Board"), consisting of Ray, Efros, Menashe, David

---

[2] *See* FAC Ex. F [hereinafter "Purchase Agr."].

[3] *See* FAC Ex. A [hereinafter "Op. Agr."].

Nichols,[4] and one independent manager (the "Independent Manager").[5] Section 5.3(a)(ii) designated Menashe as the "Series D Manager."[6]

As Series D Manager, Menashe was entitled to participate in the selection of the Independent Manager.[7] DG BF had the right to have an observer at all Board meetings so long as Menashe continued to serve as Series D Manager.[8] DG BF also secured a liquidation preference[9] and an approval right on certain amendments to the Operating Agreement.[10] Finally, the parties agreed on terms by which Menashe could be removed from his position as the Series D Manager:

---

[4] Because another member of the Nichols family is also involved in AGR, this opinion refers to "David Nichols" and "Steven Nichols" using their full names.

[5] *See* FAC ¶ 67; *see also* Op. Agr. §§ 5.3(a)(i)–(v).

[6] Op. Agr § 5.3(a)(ii).

[7] *See id.* § 5.3(a)(v).

[8] *See id.* § 5.3(d)(i).

[9] *See id.* §§ 13.2(a)–(b).

[10] *See id.* § 14.2(b).

Any Manager designated pursuant to Section 5.3(a)(i), Section 5.3(a)(ii) or Section 5.3(a)(v) may be removed during his or her term of office, with or without cause, by and only by the affirmative vote or written consent of that Person or Persons which have the power to appoint that Manager pursuant to the applicable subsection of Section 5.3(a), and in the case of Section 5.3(a)(i), as expressly provided therein. Any vacancy created by the death, resignation or removal of a Manager designated pursuant to Sections 5.3(a)(i), Section 5.3(a)(ii) or Section 5.3(a)(v) may be filled by and only by the affirmative vote or written consent of that Person or Persons which have the power to appoint that Manager pursuant to the applicable subsection of Section 5.3(a), and in the case of Section 5.3(a)(i), as expressly provided therein.[11]

Also of note is the Operating Agreement's delineation of fiduciary duties and liability for their breaches. As a general matter, the Operating Agreement preserves these duties for AGR's managers and officers:

> Subject to, and as limited by the express provisions of, this Agreement, the Managers and the Officers, in the performance of their duties as such, shall owe to the Members duties of loyalty and due care of the type owed under the laws of the State of Delaware by directors and officers to the common stockholders of a corporation incorporated under the laws of the State of Delaware and any other duties required by a nonwaivable provision of the Act. The provisions of this Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of a Manager or Officer otherwise existing at law or in equity, are agreed by the Members to replace such duties and liabilities of such Manager or Officer.[12]

---

[11] *Id.* § 5.3(b)(i). Though this provision permits removal without cause, the parties referred to this provision as the "you suck" clause during negotiations. FAC ¶ 56.

[12] Op. Agr. § 5.11.

At the same time, the Operating Agreement provides AGR's Managers with broad exculpation:

> To the maximum extent permitted under the Act, the Company hereby eliminates the personal liability of each Manager for monetary damages for breach of any duty set forth in the Act. For avoidance of doubt, a Manager does not, in any way, guarantee the return of the Member's capital contributions or a profit for the Members from the operations of the Company.[13]

June 20 also saw the execution of the "Investment Banking Agreement."[14] Under that agreement, Demeter Group gained certain rights as AGR's investment banker. The Investment Banking Agreement specified that Demeter Group's position as investment banker was contingent upon Menashe being a Board member.[15] In anticipation of the Distribution Merger, Efros specifically negotiated to carve out transactions involving "a spin-off of a Subsidiary engaged in distribution," and an IPO, as "Excluded Transactions" under that agreement.[16] Plaintiffs allege that without the Investment Banking Agreement, neither Menashe nor DG BF would have agreed to the Investment.

---

[13] *Id.* § 5.4(a).

[14] *See* FAC Ex. E [hereinafter "Investment Banking Agr."].

[15] *See id.* 6–7.

[16] *See id.* 1.

## C. After The Investment, Menashe Discovers Trouble At AGR.

After the Investment closed, Menashe began to learn the truth about several problems at AGR.

### 1. AGR's CFO, Ronald Roach, Faces Criminal And Civil Liability.

At the time of Menashe's negotiations with Efros, AGR's CFO was Ronald Roach. According to Plaintiffs, Roach was responsible for preparing the financial records and projections presented to Menashe in advance of his Investment. Roach also apparently developed the model by which Defendants made these projections. Defendants did not provide this model to Plaintiffs, claiming it was too large to send and too complicated for anyone other than Roach to understand. As of September, Roach was still responsible for managing AGR's financial affairs, including preparing its tax returns and financial reports.

On August 16, Efros asked Menashe if the two could meet in New York. When they met on August 18, Efros, for the first time, revealed to Menashe that Roach would be leaving AGR. Efros told Menashe that Roach "was a good guy" who was caught up in a "financial issue" with his former employer who was "throwing him under the bus" for some financial problems for which Roach was not

responsible.[17] Efros provided no further information to Menashe regarding Roach's "financial issue" and its effect, if any, on AGR and its investors.

Several months later, Menashe learned that the U.S. Department of Justice had been investigating Roach for securities fraud. That investigation had been ongoing while the parties were negotiating the Investment. The investigation into Roach was made public on October 21, when the Department of Justice filed criminal charges.[18] Roach pled guilty to those charges the next day, October 22.[19] Also on October 22, the Securities and Exchange Commission filed a civil complaint against Roach and a co-conspirator,[20] which Roach also settled immediately.[21] Roach and his co-conspirators admitted to being involved in a $1 billion Ponzi scheme, in which Roach prepared years of falsified financial statements to hide from investors the company's use of later investor payments to satisfy the company's financial obligations to earlier investors.

---

[17] FAC ¶ 88.

[18] *See* Information, *United States v. Roach et al.*, 2:19-cr-00182-JAM (E.D. Cal. Oct. 21, 2019), ECF No. 1.

[19] *See* Plea Agreement, *United States v. Roach et al.*, 2:19-cr-00182-JAM (E.D. Cal. Oct. 22, 2019), ECF No. 15.

[20] *See* Complaint, *Sec. & Exch. Comm'n v. Bayliss et al.*, 2:19-cv-02140-JAM-DB (E.D. Cal. Oct. 22, 2019), ECF No. 1.

[21] *See* Notice of Settlement, *Sec. & Exch. Comm'n v. Bayliss et al.*, 2:19-cv-02140-JAM-DB (E.D. Cal. Oct. 22, 2019), ECF No. 4.

Plaintiffs allege, on information and belief, that Defendants knew that Roach was under investigation before the Investment. Prior to the Investment, no one at AGR informed Menashe about Roach's legal troubles. Effective November 4, Richard Archer replaced Roach as AGR's CFO.

**2. AGR's Historical Financial Data And Projections Continue To Drop As The Series D Financing Closes.**

AGR's financial outlook only got worse after the Investment. On July 25, Menashe learned of yet another downward adjustment in both AGR's historical results and its future projections. AGR's historical monthly net income for each month between January and May 2019 was adjusted downwards by an average of approximately $161,000. AGR's projected revenue, which was over $62 million on June 1, shrank to $46,709,730 in the July adjustment. Its projected net income dropped from over $7 million to $3,428,714 in the same period. Menashe only learned of these adjustments through his associate, Kevin Raesly, who noticed a posting in AGR's online dataroom that indicated the new adjustments.

Menashe was concerned by these developments, especially given that the Series D Financing remained open. On July 26, Menashe and Raesly met Ray in San Francisco, where Ray conceded that AGR's lack of communication on these matters was unacceptable. Menashe emailed Efros, requesting an explanation for

11

these changes. Efros gave an explanation, but noted that the reasoning would not be shared with investors.[22]

AGR's numbers were not the only disappointment. The Distribution Merger, which Efros had indicated was imminent during negotiations, "disappeared after [the Investment] without explanation from Efros or Ray."[23] The Individual Defendants never spoke of it again.

Despite capital deficiencies, the Series D Financing closed on October 31. Even considering a retroactive $500,000 investment, the Series D Financing closed short of its $15 million goal. Plaintiffs allege, on information and belief, that AGR only raised $12 million in new equity in the Series D Financing, with DG BF's investment accounting for $5 million. Between July 26 and the Series D Financing's closing, AGR did not formally release any revisions in its financial records.

### 3. AGR's Financial Woes Continue And AGR Begins The Series E Financing Round.

From the early days of Menashe's involvement in AGR, Defendants allegedly ignored Plaintiffs' various governance rights. The Operating Agreement contemplated that Menashe and Ray would work together to select the Independent Manager. Section 5.3(a)(v) describes the process:

---

[22] The Amended Complaint does not allege what that explanation was.

[23] FAC ¶ 48 n.6.

12

one (1) independent manager (the "**Independent Manager**"), who is not an Affiliate of the Company or any Member thereof, selected from candidates presented by the Chief Executive Officer of the Company [Ray] to the Series D Manager [Menashe] and/or by the Series D Manager to [the] Chief Executive Officer, until such search yields a candidate that the Chief Executive Officer and the Series D Manager mutually agree to select as the Independent Manager, such determination to be made within one hundred eighty (180) days after the Final Closing Date (as such term is defined in that certain Series D Preferred Unit Purchase Agreement of even date herewith (as amended, restated or otherwise modified from time to time in accordance therewith)), or such later date as may be mutually agreed upon by the Chief Executive Officer and the Series D Manager.[24]

This provision contemplates that Menashe and Ray would exchange candidates until they came to an agreement on a suitable Independent Director, within 180 days or as extended by agreement.

Accordingly, Menashe suggested to Ray a qualified candidate for the Independent Manager seat on the Board. Ray rejected the candidate out of hand, but then reluctantly agreed to a telephone call with the candidate, during which he promised to continue discussions. He ultimately rejected the candidate, and did not engage with the process any further. Ray never suggested his own candidate, and never explained his rejection of Menashe's suggestion. It appears that the parties did not agree upon a candidate or an extension within the allotted 180 days.[25]

---

[24] Op. Agr. § 5.3(a)(v).

[25] *See* FAC ¶ 110 ("As of the date of this filing, Ray continues to withhold Menashe's right to appoint said independent manager."). While it is unclear whether the seat was ever filled, it appears that if it was, the Board did not approve the pick. *See id.* ¶ 207(f) (asserting

13

In addition, the Company only rarely held Board meetings, and its Board minutes were, in Plaintiffs' view, lacking. Ray and Efros also made several business decisions without seeking Board approval, such as (1) outsourcing and closing AGR's Sacramento manufacturing operations, (2) closing AGR's Nevada operations, and (3) making undocumented promises to a creditor.

At a December 4 Board meeting, Ray and Efros indicated that AGR was on the verge of insolvency and that its cash would run out in four months. To remedy this problem, Efros told the Board that the Company would need to raise more money in a "down round."[26] Efros proposed that Menashe and David Nichols would need to lead the financing by investing $1 million. Without their investments, Efros indicated that the financing would have "no chance."[27] Menashe sent Raesly to the meeting in his place as a Board observer, and did not receive a copy of these presentations.

Menashe continued to ask for more information and demanded Efros' resignation, among other things. At a February 11, 2020 dinner, Menashe and

_____

a "[f]ail[ure] to receive formal Board approval for a fourth director and management's board observer"). It is unclear whether the "fourth director" in this allegation is the Independent Manager, given that the Board should have five directors. There is no other mention of a "fourth director" in the Amended Complaint.

[26] FAC ¶ 113.

[27] FAC ¶ 114.

14

Steven Nichols, another major AGR investor, insisted that Efros leave his role.[28]  On a February 14 teleconference, Efros agreed to step down once the next round of financing was complete.  Ray also agreed to this paradigm in a February 17 email.

In that email, Ray indicated that the next financing round would need to be in the range of $12 to $15 million for AGR to break even and meet its debt obligations.  AGR ultimately moved forward with another financing round (the "Series E Financing"), with a goal of only $5 million.  Menashe opposed these efforts on the grounds that the proposed terms would allegedly violate DG BF's rights under the Operating Agreement, including its liquidation priority.  On June 9, the Board convened and agreed to move forward with two proposed term sheets for the Series E Financing, despite Menashe's objections.

In the background, AGR's financial situation continued to worsen.  At some point, Eric Boustani, AGR's in-house counsel, informed Menashe that the Company had exhausted DG BF's $5 million investment and was insolvent.  As of March 6, AGR's "best case" revenue projection was an expected loss of $4,838,287.  Meanwhile, Ray and Efros continued to pitch investors for the Series E Financing.  In a May 11 email, Ray informed investors that "[t]he company is laser-focused on

---

[28] *See* FAC ¶ 125.

15

reaching profitability and started the pivot from growth mode to profitability mode in Q4 2019."[29]

### 4. Plaintiffs Demand Action.

In response to AGR's problems and the Series E Financing, Menashe made numerous demands for change. On May 27, Menashe and David Nichols presented Ray with a list of demands for corporate governance changes. Ray did not make any changes based on these demands. On June 9, the same day the Board adopted the term sheets for the Series E Financing, Menashe's counsel sent a letter to Boustani and Jason Berger, AGR's outside counsel.[30] With the June 9 letter, Menashe sent a proposed settlement agreement that included extensive governance changes.[31] He also sent a draft complaint, which he threatened to file within six hours if his requests were not met.[32]

### D. Plaintiffs Initiate This Action And The Court Resolves The Issues Regarding The Series E Financing.

Menashe followed through on his threat. On June 11, Plaintiffs filed their initial complaint, motion to expedite, and motion for temporary injunctive relief,

---

[29] FAC ¶ 132.

[30] *See* D.I. 108 Ex. 1.

[31] *See* FAC Ex. U.

[32] *See id.*

16

styled as a status quo order, in this Court.[33]   On June 26, the Court heard oral argument and granted a temporary restraining order ("TRO") enjoining the closing, but not the shopping, of the Series E Financing, pending a decision on Plaintiffs' request for declaratory relief related to the Series E Financing and governance rights that Plaintiffs believed Menashe held as Series D Manager.[34]   The Court expedited consideration of that issue in view of the timeline AGR estimated for closing the Series E Financing, and the parties briefed their positions on the issue.   On July 6, the Court entered an implementing order for the TRO and heard argument on Plaintiffs' request for final declaratory relief.[35]

In a letter decision dated July 9, the Court terminated the TRO and denied Plaintiffs' requested declaratory relief.[36]  Plaintiffs moved to certify an interlocutory appeal of that decision on July 14.[37]  Defendants opposed that motion,[38] and the Court denied it on July 17.[39]   The Delaware Supreme Court also refused the

---

[33] D.I. 1.

[34] *See* D.I. 28.

[35] *See* D.I. 32; D.I. 33; D.I. 34.

[36] *See* D.I. 35; *DG BF, LLC v. Ray*, 2020 WL 3867123 (Del. Ch. July 9, 2020).

[37] *See* D.I. 38.

[38] *See* D.I. 41.

[39] *See* D.I. 44; *DG BF, LLC v. Ray*, 2020 WL 4045242 (Del. Ch. July 17, 2020).

interlocutory appeal.[40] Defendants moved for damages based on the TRO; that motion remains pending.[41]

### E. Defendants Oust Menashe From His Board Seat.

Meanwhile, Defendants allegedly began working behind the scenes to remove Menashe from his position as Series D Manager, in a retaliatory scheme designed to force through the Series E Financing. Their plan involved securing written consents from enough Series D Unitholders to remove Menashe behind his back (the "Written Consents"), then replacing Menashe with a "more malleable 'ally.'"[42]

In furtherance of this plan, Efros called each Series D Unitholder one-on-one and pressured them to sign the Written Consents. During these calls, Efros falsely claimed that he had enough votes to remove Menashe. Efros also incorrectly told the Series D Unitholders that this litigation was "over."[43] Plaintiffs allege Efros' misrepresentations induced Series D Unitholders to either go along with everyone else or abstain, and that but for those statements, more unitholders would have supported Menashe. Menashe was given neither notice about this process, nor an

---

[40] *See DG BF, LLC v. Ray*, 237 A.3d 70 (Del. 2020).

[41] *See* D.I. 93.

[42] FAC ¶¶ 139, 147; *see also id.* Ex. T.

[43] *See id.* ¶ 147.

opportunity to present his side to his fellow Series D members. Menashe also never had the opportunity to "vote" his shares.[44]

The Series D Unitholders executed the Written Consents on July 7. Pursuant to their terms, Menashe was removed as the Series D Manager, and Ryan Hudson was appointed to take his place.[45] The cover page to the Written Consents indicates that they are executed by a majority of the Series D Unitholders.[46] Plaintiffs allege this representation is false. More generally, Plaintiffs claim that the Written Consents were not validly executed, and, thus, dispute Hudson's place on the Board. Because Demeter Group's investment banking rights were tied to Menashe having a seat on the Board, Menashe's removal caused Demeter Group to lose its rights under the Investment Banking Agreement.[47]

---

[44] *See id.* ¶ 142.

[45] *Id.* Ex. T.

[46] *Id.*

[47] *See* Investment Banking Agr. 6–7.

19

### F.     Plaintiffs File The Amended Complaint.

On August 11, Plaintiffs filed their first amended complaint (the "Amended Complaint"),[48] which is the operative pleading for the purpose of this decision.  The Amended Complaint sets forth twenty-four claims:

- Counts I through IV assert breach of fiduciary duty claims against Ray and Efros, directly and derivatively.

- Counts V, VI, and VII allege breaches of the Operating Agreement.  Count V is against Ray; Count VI is against Efros; and Count VII is against AGR.

- Counts VIII and IX allege that Ray and Efros, respectively, tortiously interfered with the Operating Agreement.

- Counts X and XI allege that Ray and Efros, respectively, breached the implied covenant of good faith and fair dealing.

- Counts XII and XIII, against Ray and Efros, respectively, are for anticipatory breaches of the Operating Agreement relating to the Series E Financing.

- Counts XIV, XV, XVI, and XVII are fraud claims.  Counts XIV and XV are styled "fraud and concealment," and are pled against Efros and Ray, respectively.  Counts XVI and XVII are styled "fraudulent inducement,"

---

[48] *See generally* FAC.

20

similarly pled against Efros and Ray, respectively. All four claims also name AGR as a defendant.

- Count XVIII alleges all Defendants defamed Menashe.

- Count XIX alleges all Defendants intentionally interfered with a business relationship. Count XX alleges all Defendants intentionally interfered with a business expectancy.

- Count XXI, pled against Ray and AGR, seeks declaratory relief related to the Series E Financing.

- Count XXII, pled against all Defendants, seeks a declaration under Title 6, Section 18-110 of the Delaware Code that the July 7 Written Consents did not validly remove Menashe from the Board.

- Count XXIII is against both Individual Defendants and seeks to pierce the corporate veil under a theory that AGR is the Individual Defendants' alter ego.

- Count XXIV seeks an equitable accounting.

Defendants moved to dismiss the Amended Complaint on August 21 (the "Motion").[49] During briefing, Plaintiffs filed a "notice of partial voluntary dismissal without prejudice."[50] That notice indicated, in full:

---

[49] D.I. 55.

[50] D.I. 105.

21

> To the extent Plaintiffs' Amended Complaint dated August 11, 2020 in this action can be reasonably read or construed as asserting claims based on or arising from any other written agreement but the Sixth Amended and Restated Limited Liability Agreement executed on June 20, 2019 [the Operating Agreement], those claims are hereby dismissed without prejudice effective immediately.[51]

After the Motion was fully briefed, the Court held oral argument on November 12 and took the matter under advisement.[52]

## II.     ANALYSIS

The standard for a motion to dismiss is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[53]

With this standard in mind, I consider the allegations in the Amended Complaint on a claim-by-claim basis, considering similar claims together where appropriate.

### A.     Counts I, II, III, And IV:  Breach Of Fiduciary Duty

Counts I, II, III, and IV assert nearly identical claims for breaches of fiduciary duty.[54]  Counts I and II are styled as direct claims, and Counts III and IV are labeled

---

[51] *Id.*

[52] *See* D.I. 111.  The transcript of that hearing is at D.I. 115 [hereinafter "Hr'g Tr."].

[53] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[54] *Compare* FAC ¶¶ 161–71, *with id.* ¶¶ 172–82, *and id.* ¶¶ 183–92, *and id.* ¶¶ 193–202.

22

as derivative claims.[55] Counts I and III are pled against Ray, and Counts II and IV are pled against Efros.[56] All assert the same ten primary grounds.[57] All allege breaches of the duty of care and the duty of loyalty.[58] And all four claims seek exclusively monetary relief.[59]

These claims have invited several arguments at the pleadings stage. First, because Counts III and IV are derivative, the parties dispute whether Plaintiffs have satisfied Rule 23.1's demand requirement.[60] More fundamentally, the parties also dispute whether Counts I and II, pled as direct claims, are instead derivative claims, and should rise and fall with Counts III and IV.[61] I do not reach these disputes because, even if Plaintiffs' derivative claims could clear the higher hurdle of Rule 23.1, all four counts, as styled, fail to state a claim under Rule 12(b)(6) because the

---

[55] *See id.* at 72, 76, 80, 84.

[56] *See id.*

[57] *Compare id.* ¶¶ 167(a)–(j), *with id.* ¶¶ 178(a)–(j), *and id.* ¶¶ 188(a)–(j), *and id.* ¶¶ 198(a)–(j). All four counts also include a conclusory allegation that the Individual Defendants have stripped the Company of its assets, and a claim that Defendants' actions were "fraudulent, malicious, oppressive, and done in reckless and conscious disregard of the rights and interest of its members, constituting despicable conduct." *Compare id.* ¶¶ 168, 171, *with id.* ¶¶ 179, 182, *and id.* ¶¶ 189, 192, *and id.* ¶¶ 199, 202.

[58] *See id.* ¶¶ 167, 178, 188, 198.

[59] *See id.* at 134. Plaintiffs' request for "[a] finding that Defendants Ray and Efros have breached their fiduciary duties of loyalty and care" appears to be a request that Plaintiffs prevail, rather than a request for declaratory relief. A similar request for a "finding" accompanies nearly every count. *See, e.g.*, *id.* at 134–39.

[60] *See, e.g.*, D.I. 77 at 12; D.I. 106 at 10.

[61] *See, e.g.*, D.I. 77 at 19; D.I. 106 at 17.

managers are exculpated from the monetary liability Plaintiffs seek for their alleged breaches of fiduciary duty.[62]

Section 18-1101(e) of the Delaware Limited Liability Company Act (the "LLC Act") permits the parties to an operating agreement to eliminate or limit a manager's liability for breaches of the contractual and fiduciary duties they owe.[63] Such an exculpatory provision limits the remedies available to plaintiffs:

> By limiting or eliminating the prospect of liability but leaving in place the duty itself, a provision adopted pursuant to Section 1101(e) restricts the remedies that a party to the LLC agreement can seek. Monetary liability may be out, but injunctive relief, a decree of specific performance, rescission, the imposition of a constructive trust, and a myriad of other non-liability-based remedies remain in play.[64]

In the shadow of an exculpation clause, a plaintiff must plead non-exculpated claims to survive a motion to dismiss.[65]

---

[62] *See McPhadden v. Sidhu*, 964 A.2d 1262, 1269 (Del. Ch. 2008) (noting "the pleading burden imposed by Rule 23.1 . . . is more onerous than that demanded by Rule 12(b)(6)").

[63] *See* 6 *Del. C.* § 18-1101(e).

[64] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012).

[65] *See In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1175 (Del. 2015) ("A plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss . . . .").

Here, AGR's Operating Agreement holds its managers to the traditional fiduciary duties of care and loyalty.[66] But Section 5.4(a) of the Operating Agreement provides that any breach of such a duty is exculpated to the fullest permissible extent:

> To the **maximum extent permitted under the Act**, the Company hereby eliminates the personal liability of each Manager for monetary damages for breach of any duty set forth in the Act. For avoidance of doubt, a Manager does not, in any way, guarantee the return of the Member's capital contributions or a profit for the Members from the operations of the Company.[67]

Title 6, Section 18-1101(e) identifies the outer bound of exculpation permitted under the LLC Act as the implied covenant of good faith and fair dealing:

> A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.[68]

---

[66] *See* Op. Agr. § 5.11; *see also Mehra v. Teller*, 2021 WL 300352, at *28 (Del. Ch. Jan. 29, 2021) (citing 6 *Del. C.* § 18-1104) ("By default, limited liability company managers owe fiduciary duties akin to those owed by directors of a corporation.").

[67] Op. Agr. § 5.4(a) (emphasis added). The Operating Agreement defines the "Act" as the LLC Act. *See id.* § 1.1 (defining "Act").

[68] 6 *Del. C.* § 18-1101(e); *see also Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (interpreting an exculpatory provision that eliminated "all liability except in case of 'fraudulent or illegal conduct'" as limiting liability except for "claims of 'fraudulent or illegal conduct,' or 'bad faith violation[s] of the implied covenant of good faith and fair dealing'").

25

As this Court observed in *Kelly v. Blum*, "[w]hile somewhat analogous to 8 *Del. C.* § 102(b)(7), which authorizes a corporation to adopt provisions limiting liability for a director's breach of the duty of care, Section 18-1101(e) goes further by allowing broad exculpation of *all* liabilities for breach of fiduciary duties[—]including the duty of loyalty."[69] Exculpation to the "maximum extent permitted under the [LLC] Act" thus requires dismissal of fiduciary duty and contract claims against exculpated managers where the claims seek only monetary damages; claims for damages under the implied covenant stand.

By exculpating the Individual Directors "to the maximum extent permitted under the Act,"[70] Section 5.4 of the Operating Agreement exculpates "*all* liabilities for breach of fiduciary duties."[71] Counts I through IV seek only monetary liability for Ray and Efros' purported breaches of fiduciary duty.[72] That relief is precluded by Section 5.4.[73] Counts I through IV fail to state a non-exculpated claim.[74] Accordingly, they are dismissed under Rule 12(b)(6).

---

[69] 2010 WL 629850, at *11 (Del. Ch. Feb. 24, 2010).

[70] Op. Agr. § 5.4(a).

[71] *Kelly*, 2010 WL 629850, at *11.

[72] *See* FAC at 134.

[73] *See* Op. Agr. § 5.4(a).

[74] *See Cornerstone*, 115 A.3d at 1175. Given that Plaintiffs' fiduciary duty claims are exculpated, it is also unlikely that Plaintiffs could establish demand futility under Rule 23.1. *See Wood*, 953 A.2d at 141.

26

## B. Counts V, VI, And VII:  Breach Of Contract

Counts V, VI, and VII allege that Ray, Efros, and AGR, respectively, each breached the Operating Agreement.  The Amended Complaint seeks money damages and specific performance to remedy these alleged breaches.[75]  All three counts allege twelve identical breaches of the Operating Agreement, namely:

a. "Failing to conduct regular meetings of the Board at least quarterly as required by Section 5.3(c)(iii) of the Operating Agreement and to provide adequate and sufficient notice of any meeting of the Board that was, in fact, conducted;"

b. "Failing to keep and retain minutes of Board meetings, and distributing to all Managers prior to the next Board meeting as required by Sections 5.3(c)(i) and (iii) of the Operating Agreement;"

c. "Failing to deliver reports of unaudited financial statements to each Member owning at least 20% of any class or series of Preferred Units then outstanding as required by Sections 9.3(a) and (b) of the Operating Agreement (when DG BF owns more than 20% of Series D);"

d. "Failing to execute non-competition and non-solicitation agreement for each executive of the Company as required by Section 5.10(a) of the Operating Agreement;"

e. "Denying Menashe his explicitly granted rights under Section 5.3(a)(v) of the Operating Agreement as the Series D Manager and power to appoint an independent manager;"

f. "Failing to receive formal Board approval for a fourth director and management's board observer;"

---

[75] *See* FAC at 135.

27

g.  "Failing to receive formal Board support of significant change in business strategy, specifically closing Nevada operations despite this being a change of business strategy requiring Board approval per Section 5.3(c)(vi)(J) of the Operating Agreement;"

h.  "Failing to receive formal Board support of outsourcing the Sacramento manufacturing operations and subsequent closing the operations despite this being a change of business strategy requiring Board approval per Section 5.3(c)(vi)(J) of the Operating Agreement;"

i.  "Entering into certain promises without documentation with Apple Core on behalf of the Company and without the Board's prior written consent or vote of a majority of the Board despite taking on new secured debt which requires Board approval per 5.3(c)(vi)(D);"

j.  "Failing to ensure that any "promises" Efros made to third-parties, including the Company's debt holders, are identified, reviewed by the Board and documented, as needed, and—at a minimum—Board oversight is provided on all discussions Efros has underway related to the Series E financing and debt negotiation;"

k.  "Failing to ensure Efros' messaging on the Company's strategic and financial direction to potential Series E investors is consistent with the Board approved business strategy; and"

l.  "Hiring Richard Archer as an executive officer of the Company without prior written consent or vote of a majority of Board of Managers in violation of Section 5.3(c)(vi)(I) of the Operating Agreement much less a deliberative process of any kind."[76]

Defendants do not argue that these allegations fail to present a breach of the Operating Agreement.[77] Rather, the Motion points to other deficiencies.

---

[76] FAC ¶¶ 207(a)–(l), 214(a)–(l), 221(a)–(l).

[77] *See* D.I. 77 at 24–27; D.I. 108 at 12–16.

First, Defendants contend that Count VII, alleging that AGR breached the Operating Agreement, cannot proceed alongside Plaintiffs' derivative claims in Counts III and IV.[78] But Counts I through IV are now dismissed. Defendants do not offer an alternative ground for dismissing Count VII.[79] And so, with respect to Count VII, the Motion is denied.

Counts V and VI allege the Individual Defendants committed the same breaches that Plaintiffs attribute to AGR in Count VII. Defendants' primary argument for dismissing these Counts is that none of the provisions Plaintiffs cite bind the Individual Defendants. "The extent to which the limited liability company agreement is binding on and enforceable against a particular person is in the first instance a function of general contract law principles."[80] "In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[81]

---

[78] *See* D.I. 77 at 26–27; D.I. 108 at 14–16.

[79] *See* D.I. 77 at 26–27; D.I. 108 at 14–16.

[80] Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 4.09[A], at 4-54 (2nd ed. & Supp. 2019).

[81] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

The allegations in subparagraphs (f), (j), and (k) do not cite a provision of the Operating Agreement that binds the Individual Defendants and, in fact, have not cited any provision in the contract at all.[82] Plaintiffs have failed to identify any such a provision in their brief and, in doing so, waived that argument.[83] And so, with respect to those issues, Counts V and VI are dismissed.

The Operating Agreement provisions cited in subparagraphs (a) and (b) do not specify which party has the obligation to perform them; both are written in the passive voice.[84] Subparagraphs (c) and (d) cite provisions of the Operating Agreement governing AGR generally.[85] For example, Sections 5.10(a) and 9.3(a) and (b) require "the Company [to] cause" certain conditions.[86] The same is true of the provisions cited in subparagraphs (g), (h), (i), and (l),[87] which prohibit only "the Company [and] its subsidiaries" from taking certain actions.[88]

---

[82] *See* FAC ¶¶ 207(f), 207(j), 207(k), 214(f), 214(j), 214(k).

[83] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[84] *See, e.g.*, Op. Agr. § 5.3(c)(iii) ("Regular meetings of the Board shall be held at least quarterly with reasonable notice to all Managers. . . . Minutes of each meeting shall be kept and retained with the books and records of the Company and distributed to all Managers prior to the next Board meeting.").

[85] *See* FAC ¶¶ 207(c)–(d), 214(c)–(d).

[86] *See* Op. Agr. §§ 5.10(a), 9.3(a)–(b).

[87] *See* FAC ¶¶ 207(g), 207(h), 207(i), 207(l), 214(g), 214(h), 214(i), 214(l).

[88] *See* Op. Agr. § 5.3(c)(vi).

It appears that these provisions bind the Board, to which AGR has delegated the "full and entire management of [its] business and affairs."[89] These provisions do not impose any obligation specifically on the Individual Defendants; they bind the Board, of which the Individual Defendants are members. They stand in stark contrast to those in the relevant case Plaintiffs cites, in which the operating agreement enumerated specific duties for the managers to carry out.[90]

To the extent the Individual Defendants, as managers, participated in the Company's or the Board's breaches of any of these obligations, their conduct may only be remedied by equitable relief.[91] Even if Plaintiffs could state a claim that the

---

[89] *Id.* § 5.1; *see id.* § 5.2(a)–(s) (outlining the powers of AGR's Board); *see also Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1215 (Del. Ch. 2010) ("A corporation is an artificial being created by law. . . . Being artificial and the mere creature of the law, it can only act by its officers and agents." (quoting *Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.*, 156 A. 350, 351 (Del. Super. 1931))).

[90] *See* D.I. 106 at 26 (citing *2009 Caiola Fam. Tr. v. PWA, LLC*, 2015 WL 6007596, at *19 (Del. Ch. Oct. 14, 2015) (describing the "Managing Member duties" allegedly breached by the defendant manager); and also citing *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *19 (Del. Ch. Oct. 10, 2006) (failing to support Plaintiffs' position)).

[91] The Individual Defendants are not liable in their capacities as managers for any money damages stemming from a breach of any duty set forth in the LLC Act. *See supra*, Section IIA. This includes breaches of contract. *Compare* Op. Agr. § 5.4(a) ("To the maximum extent permitted under the Act, the Company hereby eliminates the personal liability of each Manager for monetary damages for breach of any duty set forth in the Act."), *with* 6 *Del. C.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract . . . of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement . . . ."). Accordingly, the only relief available under Counts V and VI to remedy such a breach is equitable relief, including the specific performance Plaintiffs seek. *See* FAC at 135; *see also Feeley*, 62 A.3d at 664.

31

Individual Defendants breached the Operating Agreement, they could obtain, at most, an order for specific performance of the breached provisions: an order requiring the Board to hold a meeting, an order requiring the Board to keep minutes of that meeting, an order requiring AGR to deliver reports of unaudited financial statements, and so on. The Individual Defendants, as members of the Board, would be required to abide by any order that bound AGR and its Board.[92] These breaches, which are repeated in Count VII against AGR, are relegated to that Count and are dismissed as against the Individual Defendants, with the understanding that the Individual Defendants as Board members would be bound by an order of specific performance directed at AGR.

The only alleged breach that specifically inures to an Individual Defendant is the breach of subparagraph (e) of Counts V and VI, which cites the provision by which Menashe and Ray are to select the Independent Manager.[93] Defendants' argument that neither Ray nor Efros are bound by the breached provisions does not hold with Section 5.3(a)(v).[94] This provision obliges Ray, as CEO, to work with

---

[92] *See Deutsch v. ZST Dig. Networks, Inc.*, 2018 WL 3005822, at *10 (Del. Ch. June 14, 2018) (explaining that "an order that applies to an entity extends to its directors" and collecting cases).

[93] *See* FAC ¶¶ 207(e), 214(e) (citing Op. Agr. § 5.3(a)(v)).

[94] Defendants also argue that Section 5.12 of the Operating Agreement bars a claim against the Individual Defendants. The relevant language provides:

32

Menashe to appoint the Independent Manager within 180 days of the Final Closing Date.[95] While the status of the Independent Manager is unclear from the face of the Amended Complaint, Defendants do not contest the underlying breach. The parties have not briefed whether Ray could be liable for his breaches as AGR's CEO in face of the exculpation clause in Section 5.4, which addresses managers.[96] I leave the question of how to remedy Ray's alleged breach for another day. Because at least equitable relief is available, Plaintiffs have sufficiently stated a claim against Ray.[97] This provision does not bind Efros, so the allegation in paragraph 214(e) of Count VI is dismissed.

In sum, the Motion is granted in part with respect to Count V against Ray, except with respect to the allegation in paragraph 207(e), for which the Motion is denied. With respect to Count VI against Efros, the Motion is granted.

---

No individual who is a Manager or an Officer of the Company, or any combination of the foregoing, shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager or an Officer of the Company or any combination of the foregoing.

Op. Agr. § 5.12. This provision does not bar a claim that Ray breached Section 5.3(a)(v). Ray, not AGR, is obliged to perform under this provision.

[95] See id. § 5.3(a)(v).

[96] See id. § 5.4.

[97] See FAC at 135 (seeking equitable relief).

## C. Counts VIII And IX: Tortious Interference With Contract

Counts VIII and IX plead practically identical claims that Ray and Efros tortiously interfered with the Operating Agreement by "knowingly and intentionally caus[ing] AGR to not perform its duties to Plaintiffs and act against its obligations under the Operating Agreement."[98] Plaintiffs allege that the Individual Defendants' behavior was "a significant factor in causing AGR to breach the Operating Agreement" as asserted in Count VII.[99]

It is well settled that a party to a contract cannot be held liable for tortiously interfering with it:

> [Restatement (Second) of Torts] Section 766 requires that the contract that forms the subject of a tortious interference claim be between "another and a third person," but that requirement reflects the noncontroversial proposition that "a party to a contract cannot be liable both for breach of [a] contract and for inducing that breach." Another way to describe that requirement is that the defendant must be "a stranger to the contract."[100]

---

[98] *See id.* ¶¶ 229, 239.

[99] *Id.* ¶¶ 229, 239.

[100] *Bandera Master Fund LP v. Boardwalk Pipeline P'rs*, LP, 2019 WL 4927053, at *28 (Del. Ch. Oct. 7, 2019) (second alteration in original) (internal citations omitted); *see also Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) ("First, it is 'rudimentary that a party to a contract cannot be liable both for breach of [a] contract and for inducing that breach.'" (quoting *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994))); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 884 (Del. Ch. 2009) ("It is well settled that a party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract."); *WyPie Invs., LLC v. Homschek*, 2018 WL 1581981, at *14 (Del. Super. Ct. Mar. 28, 2018) ("Defendants also argue that Plaintiff's claim must be dismissed because [individual defendants] are signatories to the agreement and

Here, Plaintiffs allege each Individual Defendant signed the Operating Agreement "in his individual capacity as a Manager and as a unit owner."[101] As parties to the Operating Agreement, Ray and Efros cannot be liable in tort for causing a breach of that agreement.[102] None of the authority Plaintiffs cite disputes that "noncontroversial proposition."[103] With respect to Counts VIII and IX, the Motion is granted.

### D. Counts X And XI: Breaches Of The Implied Covenant Of Good Faith And Fair Dealing

Counts X and XI plead nearly identical claims for breach of the implied covenant of good faith and fair dealing against each of the Individual Defendants.[104] The bases for these claims are twofold: (1) that the Individual Defendants effectuated Menashe's removal from the Board, and (2) that the Individual

---

'defendant[s] cannot interfere with [their] own contract.' . . . Plaintiff does not dispute the princip[le] that parties cannot interfere with their contract . . . .").

    The Individual Defendants also seek dismissal because they are not strangers to the business relationship giving rise to and underpinning the contract that was breached. Because the Individual Defendants are not even strangers to the contract, I need not reach this more abstract theory of the alleged tortfeasors' connection to the contractual relationship.

[101] *See* FAC ¶¶ 204, 211. The Operating Agreement attached to the FAC is unsigned, and only Ray's signature block was included. That signature block indicates Ray would have signed above "Title: Manager." *See* Op. Agr. 63.

[102] *See, e.g.*, *Boardwalk*, 2019 WL 4927053, at *28.

[103] *Id.*

[104] *Compare* FAC ¶¶ 244–52, *with id.* ¶¶ 253–62.

Defendants did not engage in good faith with regard to selecting the Independent Manager under Section 5.3(a)(v) of the Operating Agreement.[105]

"The implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[106] "To state a claim for breach of the implied covenant, the Plaintiffs 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'"[107] Additionally, to survive a motion to dismiss, Plaintiffs "must allege that the [decision] was motivated by an improper purpose."[108]

"[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare,"[109] especially "when the contract easily could have been drafted to expressly provide

---

[105] *See id.* ¶¶ 250, 260.

[106] *Kuroda*, 971 A.2d at 888 (internal quotation marks omitted).

[107] *Wiggs v. Summit Midstream P'rs, LLC*, 2013 WL 1286180, at *9 (Del. Ch. Mar. 28, 2013) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[108] *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020).

[109] *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006).

for it."[110]  "It must be 'clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter.'"[111] The implied covenant "cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty unattached to the underlying legal documents.'"[112]

An essential predicate for the application of the implied covenant is the existence of a "gap" in the relevant agreement.[113]  "The implied covenant provides a limited gap-filling tool that allows a court to impose contractual terms to which the parties would have agreed had they anticipated a situation they failed to [address]."[114]  "When a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."[115]  Even then, the implied covenant does not come into play when "the scope of discretion is

---

[110] *Airborne*, 984 A.2d at 146 (quoting *Allied Cap. Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006)).

[111] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (alterations omitted) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)).

[112] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (alterations omitted) (quoting *Glenfed Fin. Corp., Com. Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)).

[113] *See Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *4 (Del. Ch. Jan. 30, 2015).

[114] *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *10 (Del. Ch. Jan. 18, 2013).

[115] *Airborne*, 984 A.2d at 146–47; *see also Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 638 (Del. Ch. 2011).

37

specified," because in that instance, "there is no gap."[116] Moreover, there is no gap when an "[a]greement expressly provides for the way in which" a process ought to occur.[117] In those cases, "an implied covenant is not appropriate to supplement or to reform the express terms for the process," or to expand the agreement to include new parties in that process.[118] Simply put, parties may not invoke the implied covenant with respect to "conduct authorized by the terms of the agreement."[119]

Once a plaintiff establishes that the implied covenant applies, she must show that the covenant was breached. "To prove that the defendant has failed to exercise its discretion in good faith, the plaintiff must show that the exercise of discretion was done in bad faith (i.e., that it was motivated by an improper purpose or done with a culpable mental state)."[120]

### 1. Removing Menashe From The Board

Plaintiffs fail to state a claim that the Individual Defendants' actions associated with Menashe's removal as the Series D Manager breached the implied

---

[116] *Policeman's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012).

[117] *Wiggs*, 2013 WL 1286180, at *9.

[118] *See id.*

[119] *Dunlap*, 878 A.2d at 441; *see also Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010) (explaining the implied covenant may not be used to contradict "a clear exercise of an express contractual right").

[120] *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2009 WL 3756700, at *5 (Del. Ch. Nov. 9, 2009).

covenant of good faith and fair dealing. Section 5.3(b)(i) provides that the Series D Manager may only be removed "by and only by the affirmative vote or written consent of" the Series D Unitholders.[121] This provision makes no mention of the Board, its members, or either Individual Defendant.[122] Rather, it grants the Series D Unitholders an "express contractual right."[123]

Thus, the Operating Agreement already provides for a specific process by which a Series D Manager may be removed. There is no gap to fill, and an implied term would limit and alter that express process. It is not clear, nor even suggested, that had the parties thought to negotiate with respect to this provision, they would have contracted for an express covenant governing the Board's role: the Board is wholly excluded from the removal process. Plaintiffs fail to advance any express provision of the Operating Agreement that supports the finding that the parties would have agreed to impose contractual duties on the Board in connection with the Series D Manager's removal, had they thought of it.[124] To the contrary: implying terms governing the Board members' behavior *vis-à-vis* the Series D Manager's removal

---

[121] Op. Agr. § 5.3(b)(i).

[122] *See id.*

[123] *See Nemec*, 991 A.2d at 1127.

[124] *See Lonergan*, 5 A.3d at 1018 ("The Court must focus on what the parties likely would have done if they had considered the issues involved. It must be clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter." (internal citations, quotation marks, and alterations omitted)).

would improperly "create a free-floating duty" for the Board.[125]  Reading in an implied covenant where there is no gap to fill—specifically with respect to a provision that grants decision-making authority to the Series D Unitholders while making no mention of Efros, Ray, or the Board—would be improper and expand the "narrow band of cases" in which reading in an implied covenant is appropriate.[126]

With respect to this issue, Counts X and XI are dismissed.

### 2. The Independent Manager

Plaintiffs' allegations about the selection of the Independent Manager do state a claim for breach of the implied covenant.  Section 5.3(a)(v) of the Operating Agreement provides the process for appointing the Independent Manager.[127]  Its language outlines the parties' obligations during the selection of the Independent Manager:  Menashe may present candidates for Ray's consideration; Ray may present candidates for Menashe's consideration; and the process continues until the two agree, which is to occur within 180 days of the Final Closing Date.[128]  If the parties do not come to an agreement within that time, they may mutually agree to

---

[125] *Dunlap*, 878 A.2d at 441 (Del. 2005); *see also CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *16 (Del. Ch. June 23, 2015) (explaining that non-parties to a contract are not bound by the implied covenant).

[126] *Airborne*, 984 A.2d at 146.

[127] Op. Agr. § 5.3(a)(v).

[128] *See id.*

extend the deadline.[129]  Plaintiffs contend that Ray's refusal to consider Menashe's candidate and cooperate during this process amounts to a breach of the implied covenant.

"When a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."[130]  The implied covenant operates to prevent a party from acting unreasonably to deprive the other party from receiving the fruits of its bargain.[131]  "[M]ore recent authority teaches that a claim for violation of the implied covenant of good faith and fair dealing can survive if, notwithstanding contractual language on point, the defendant failed to uphold the plaintiff's reasonable expectations under that provision."[132]

---

[129] *See id.*

[130] *Airborne*, 984 A.2d at 146–47.

[131] *See Dunlap*, 878 A.2d at 442 ("Stated in its most general terms, the implied covenant requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain.  Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." (footnotes omitted) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985))).

[132] *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *6 (Del. Ch. Jan. 29, 2015); *see also Markow v. Synageva Biopharma Corp.*, 2016 WL 1613419, at *7 (Del. Super. Ct. Mar. 3, 2016) ("More recent case law reflects a willingness to allow implied covenant claims to survive, despite the presence of relevant contractual language, where a defendant failed to 'uphold the plaintiff's reasonable expectations under that provision' or failed to exercise discretion under the contract reasonably." (footnotes omitted) (quoting *Renco*, 2015 WL 394011, at *6)).

This Court has previously considered the role of the implied covenant in contractual terms calling for the parties to negotiate among themselves. In *The Liquor Exchange, Inc. v. Tsaganos* ("*Liquor Exchange II*"), the contract provision in question gave the plaintiff, a commercial tenant, the "first right of negotiation" over newly available space, "provided the Landlord and Tenant agree upon all terms of the lease for the additional leaseable [sic] space."[133] The Court observed that the implied covenant required the landlord to negotiate with the tenant in good faith: "When applied to the Lease and specifically [the language in question], the covenant requires only that [the landlord], in good faith, give the Tenant the opportunity to negotiate for new space and that [the landlord] present and discuss good faith terms at any negotiation."[134] The Court ultimately concluded that the tenant could not wield the implied covenant to force the landlord to agree to the tenant's terms.[135]

---

[133] *The Liquor Exch., Inc. v. Tsaganos* ("*Liquor Exch. II*"), 2004 WL 5383907, at *3–4 (Del. Ch. Nov. 16, 2004) (Noble, V.C.).

[134] *Id.* at *4; *see also Blaustein v. Lord Baltimore Cap. Corp.*, 2013 WL 1810956, at *7 (Del. Ch. Apr. 30, 2013) (Noble, V.C) ("In *Liquor Exchange II*, the Court observed that the covenant of good faith and fair dealing 'requires only that [the landlord], in good faith, give the Tenant the opportunity to negotiate for new space and that [the landlord] present and discuss good faith terms at any negotiation.' Though it recognized an implied covenant, the Court emphasized that the parties retained discretion to complete a deal on their own terms, subject to that implied covenant: '[t]here is no requirement that [the Landlord] must alter his good faith terms to reach an agreement with the Tenant.' (alterations in original) (quoting *Liquor Exch. II*, 2004 WL 5383907, at *4)), *aff'd*, 84 A.3d 954 (Del. 2014).

[135] *The Liquor Exch. II*, 2004 WL 5383907, at *4 ("There is no requirement that [the landlord] must alter his good faith terms to reach an agreement with the Tenant.").

This case presents a similar agreement to negotiate, whereby Ray and Menashe were to cooperate to select the Independent Manager.[136] There is space for the implied covenant to operate in the parties' agreement. While Section 5.3(a)(v) speaks to the general process by which Ray and Menashe would select the Independent Manager, it does not contain language explicitly requiring Ray to participate in the process in good faith.[137] Had the parties considered the possibility that one party would not participate, it appears that they would have included language addressing the issue: the Operating Agreement contemplates that the two men must collaborate to agree on a candidate or, alternatively, to an extension.[138] The implied covenant operates to fill that gap and require that the parties negotiate in good faith.

The Amended Complaint also adequately pleads a breach of the implied covenant, as the facts alleged adequately suggest that Ray's failure to negotiate "was

---

[136] *See* Op. Agr. § 5.3(a)(v).

[137] *See id.*

[138] *See id.* Unlike the plaintiff in *Liquor Exchange II*, Plaintiffs here do not attempt to use the implied covenant to force Ray into a particular agreement, like accepting Menashe's candidate. *See* 2004 WL 5383907, at *4. Rather, the Amended Complaint alleges that Ray failed to meaningfully participate in negotiations with Menashe in the first instance, refusing to cooperate in the process and properly engage with Menashe's candidate. *See* FAC ¶ 110. The term Plaintiffs seek to imply requires Ray to cooperate, not to agree. The alleged breach of that implied covenant was Ray's bad faith failure to engage and negotiate, not his decision to reject Menashe's suggested candidate.

motivated by an improper purpose."[139]  Plaintiffs allege that Ray refused to cooperate throughout the process, stringing Menashe and his candidate along, and ultimately rejecting his suggestion without explanation.  This goes beyond "[n]egotiating forcefully and within the bounds of rights granted by the [Operating Agreement]."[140]  Plaintiffs allege Ray "rebuffed" his obligations "and let the suggestion die on the vine," in "one more significant refusal to engage in good faith corporate governance under the Operating Agreement."[141]  Given these allegations, it is reasonable to infer that Ray's failure to engage with or negotiate regarding Menashe's proffered candidate was in bad faith or for some improper purpose, and therefore breached the implied covenant.

Plaintiffs also allege that Ray did not present a candidate of his own, and that Ray and Menashe did not come to an agreement on a candidate within 180 days.[142] To the extent that this conduct is improper, it is expressly governed by the language of Section 5.3(a)(v), not by any obligation implied therein.  Indeed, the portion of Count V that survives the Motion makes exactly that claim.[143]  Count X for breach

---

[139] *Sheehan*, 2020 WL 2838575, at *11.

[140] *See Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10–11 (Del. Ch. May 7, 2008).

[141] FAC ¶ 110.

[142] *See id.*

[143] *See id.* ¶ 207(e).

of the implied covenant cannot reach conduct that is governed by the plain terms of the Operating Agreement.

Because the Amended Complaint states a claim that Ray breached the implied covenant during the Independent Manager selection process in his engagement with Menashe and his candidate, the Motion is denied with respect to Count X. There are no allegations regarding Efros' role in these negotiations, so with respect to Count XI, the Motion is granted.

### E.     Counts XIX And XX:  The Intentional Interference Claims

Counts XIX and XX allege that the Individual Defendants committed a tort when they interfered with Menashe's seat on the AGR Board.[144]  Count XIX frames Menashe's board seat as a "business relationship," while Count XX frames it as a

---

[144] *See id.* ¶¶ 340–351.

"business expectancy."[145]  Because the tests used to analyze tortious interference

with these prospects are nearly identical,[146] I consider the claims simultaneously.

To survive a motion to dismiss, "a claim for tortious interference with

business relations must allege:  '(a) the reasonable probability of a business

opportunity, (b) the intentional interference by defendant with that opportunity, (c)

proximate causation, and (d) damages.'"[147]  These elements must be considered "in

light of a defendant's privilege to compete or protect his business interests in a fair

and lawful manner."[148]  In order to adequately allege this first element, the claimant

---

[145] Delaware courts usually frame the tort as tortious interference with existing or prospective business relations, where a claimant has a reasonable probability of a business opportunity that is intentionally interfered with by a third party to the detriment of the claimant.  *See Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001) (describing the tort as "tortious interference with business *relations*" and requiring a plaintiff to allege "the reasonable probability of a business *opportunity*" (emphasis added)).  This business opportunity may come in the form of a business relationship or a business expectancy. *See Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *5 (Del. Ch. Apr. 19, 2006) (explaining that "[t]he elements of a claim of tortious interference with prospect business relation[s]" include "the existence of a reasonable probability of a business expectancy"); s*ee also Preston Hollow Cap. LLC v. Nuveen LLC* (*Preston Hollow II*), 2020 WL 1814756, at *13 (Del. Ch. Apr. 9, 2020) (describing how to determine "whether a business opportunity constitutes a bona fide expectancy"); *Shore Invs., Inc. v. Bhole, Inc.*, 2011 WL 5967253, at *14–15 (Del. Ch. Nov. 28, 2011) (using "relation" and "expectation" interchangeably).

[146] *Compare Malpiede*, 780 A.2d at 1099, *with Collier*, 2006 WL 1134170, at *5.  *Collier* includes "the interferer's knowledge of the expectancy" as an element of a tortious interference with a business relationship claim, whereas *Malpiede* does not.  However, this knowledge element is implicit in the *Malpiede* test which focuses on intent, and the two operate identically.

[147] *Malpiede*, 780 A.2d at 1099 (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981)).

[148] *DeBonaventura*, 428 A.2d at 1153.

must allege "a *bona fide* expectancy,"[149] "'something more than a mere hope[,] . . . the innate optimism of the salesman,' or a 'mere perception of a prospective business relationship.'"[150] The claim will be dismissed for failure to establish a reasonable probability of a business opportunity if the opportunity is too speculative.[151] But the claim "does not require an existing contract between the parties" with respect to the business opportunity.[152] Whether cast as an expectancy or a prospective business relationship, all business opportunities, within the meaning of this tort, must be "of 'potential pecuniary value to the plaintiff.'"[153]

Defendants move to dismiss upon the grounds that Plaintiffs fail to adequately allege a reasonable probability of a business opportunity.[154] I agree that Plaintiffs have failed to adequately plead this element. The potential for Menashe to maintain his Board seat does not equate to a business opportunity, expectancy, or relationship.

---

[149] *World Energy Ventures, LLC v. Northwind Gulf Coast*, 2015 WL 6772638, at *7 (Del. Ch. Nov. 2, 2015) (quoting *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1285 (Del. Ch. 2001)).

[150] *Carney v. B & B Serv. Co.*, 2019 WL 5579490, at *2 (Del. Ch. Oct. 29, 2019) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009), and also quoting *Lipson*, 790 A.2d at 1285.

[151] *See Preston Hollow II*, 2020 WL 1814756, at *12 (stating that "speculative prospects" are not enough).

[152] *See id.* (citing *Bove v. Goldenberg*, 2007 WL 446014, at *4 (Del. Super. Ct. Feb. 7, 2007)).

[153] *Lipson*, 790 A.2d at 1285 (alteration omitted) (quoting Restatement (Second) of Torts, § 766(B), cmt. c (Am. L. Inst. 1979)).

[154] D.I. 77 at 46–49.

Menashe's Board seat was not compensated, and therefore not directly of potential pecuniary value.[155] Plaintiffs attempt to establish that a formalized contractual relationship *ipso facto* presents a business opportunity, citing *Preston Hollow Capital LLC v. Nuveen LLC* (*Preston Hollow II*).[156] But the lost relationships and contracts in that case still directly provided the plaintiffs with the requisite monetary gain.[157]

Menashe attempts to identify two sources of pecuniary gain from his Board seat. First, he asserts that his Series D Manager position was a business opportunity because it gave him "better control of his sizable investment."[158] This falls short of the mark. Even if a Board seat gave Menashe better control of his investment, such control in turn offers only a "mere hope" or optimistic wish of pecuniary gain.[159] Further, even if such control translated into pecuniary gain, the at-will nature of Menashe's Board seat means that even absent any alleged interference, continued

---

[155] *See Lipson*, 790 A.2d at 1285.

[156] D.I. 106 at 49.

[157] *Preston Hollow II*, 2020 WL 1814756, at *13–14.

[158] D.I. 106 at 49.

[159] *Carney*, 2019 WL 5579490, at *2 (Del. Ch. Oct. 29, 2019) (quoting *Agilent Techs.*, 2009 WL 119865, at *7). Indeed, Menashe was not able to wield his Board seat to stop the Series E Financing without resorting to litigation, nor to stop Plaintiffs from taking the actions he complains of in the Amended Complaint, nor to reap a return on his investment.

control was hardly guaranteed.[160]  As a matter of law, such day-by-day control, which itself amounts only to a hope for pecuniary gain, fails to transform Menashe's Board seat into a reasonably probable business opportunity.

Second, the Amended Complaint alleges that by removing Menashe from his position as Series D Manager, Defendants caused Demeter Group to lose its benefits under the Investment Banking Agreement.  But any business opportunity relating to the Investment Banking Agreement belonged to Demeter Group, not Menashe or DG BF.  Plaintiffs cannot be heard to have lost a potential business opportunity that belonged to Demeter Group.[161]  With respect to Counts XIX and XX, the Motion is granted.

### F.  Counts XIV, XV, XVI, And XVII:  Fraud

Plaintiffs' fraud theory is presented via four counts:  two claims against each Individual Defendant.  Counts XIV and XV allege nearly identical claims styled as

---

[160] *See* Op. Agr. § 5.3(b)(i).  To be perfectly clear, the at-will nature of Menashe's Board seat meant he could lose control of his investment at any time, such that the otherwise uncompensated Board seat offered no certain monetary gain.  At-will contracts that offer certain pecuniary gain may be the subject of tortious interference.  *See, e.g.*, *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 98 (Del. 2006) (noting tortious interference with an at-will contract warranted lost profits that the plaintiff would have earned under the contract).

[161] In order to properly allege that a reasonable business opportunity exists, the plaintiff "'must identify a specific party who was prepared to enter into a business relationship *with the plaintiff*.'" *Carney*, 2019 WL 5579490, at *2 (Del. Ch. Oct. 29, 2019) (emphasis added) (quoting *Orthopaedic Assocs. of S. Del., P.A. v. Pfaff*, 2018 WL 822020, at *2 (Del. Super. Ct. Feb. 9, 2018)).

"fraud and concealment,"[162] while Counts XVI and XVII are also substantially identical to one another and styled "fraudulent inducement."[163] In all four counts, Plaintiffs allege that Defendants' various misrepresentations induced them to enter into the Operating Agreement.[164] At argument, Plaintiffs emphasized (a) the fact that Defendants did not disclose the criminal investigation surrounding Roach; (b) Efros' representations about AGR's historical financial data and projected future success; (c) Efros' representations about the Distribution Merger; and (d) the representation that the Series D Financing would close after raising at least $15 million.[165] These statements allegedly caused DG BF to invest in AGR, and, by extension, Menashe to create and invest through DG BF.

Whether Plaintiffs' claims are cast as common law fraud, fraudulent concealment, or fraudulent inducement, similar pleading requirements apply. To survive a motion to dismiss on a claim for fraud, a plaintiff must plead:

---

[162] *Compare* FAC ¶¶ 275–93, *with id.* ¶¶ 294–311.

[163] *Compare id.* ¶¶ 312–22, *with id.* ¶¶ 323–34.

[164] *See* Hr'g Tr. 54:20–55:13; *see generally* FAC ¶¶ 275–334.

[165] *See* Hr'g Tr. 50:17–51:22.

1) a false representation, usually one of fact; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.[166]

Court of Chancery Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."[167]

---

[166] *Hauspie v. Stonington P'rs, Inc.*, 945 A.2d 584, 586 (Del. 2008) (alterations omitted); *see also Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) ("The elements of common law fraud that a plaintiff must plead are familiar. To state a claim, the plaintiff must plead facts supporting an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance."); *ITW Glob. Invs. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super. Ct. Mar. 6, 2017) ("The elements of fraudulent inducement are: 1) a false statement or misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result. The knowledge that the statement was false, or made with reckless indifference to the truth, is commonly referred to as scienter." (footnotes and internal quotation marks omitted)); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987) ("To establish a prima facie case of intentional misrepresentation (fraudulent concealment), the following elements must be proven: (1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) That the defendant acted with scienter; (3) An intent to induce plaintiff's reliance upon the concealment; (4) Causation; and (5) Damages resulting from the concealment.").

[167] Ct. Ch. R. 9(b).

To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations. Essentially, the plaintiff is required to allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim.[168]

This heightened standard for the circumstances of an alleged fraud is distinct from state of mind and knowledge, which plaintiffs may aver generally.[169] "[W]hen a plaintiff pleads a claim of fraud that charges that the defendants knew something, it must allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it."[170]

### 1. Counts XV And XVII Fail To State Claims Against Ray.

As a threshold matter, Plaintiffs do not state a claim against Ray. The Amended Complaint does not suggest that Ray made any representations to Menashe in advance of the Investment. Rather, it explicitly states that Menashe's sole point of contact during the negotiations was Efros.[171] Plaintiffs' attempt to impute Efros' conduct and statements onto Ray with cursory allegations that the two

---

[168] *Abry P'rs*, 891 A.2d at 1050 (footnotes omitted).

[169] *See* Ct. Ch. R. 9(b).

[170] *Abry P'rs*, 891 A.2d at 1050 (footnotes omitted).

[171] *See* FAC ¶ 59; *see also id.* ¶ 85 ("From the outset, Menashe exclusively engaged with Efros for his potential Series D investment in AGR and Bloom Farms.").

were "working in tandem"[172] falls well short of the particularity required by Rule 9(b). And so, with respect to Counts XV and XVII, the Motion is granted.

### 2. Defendants' Anti-Reliance Argument Fails.

With respect to Counts XIV and XVI, Defendants claim that anti-reliance language precludes Plaintiffs' reliance on extra-contractual representations as a basis for their fraud claims. At argument, Plaintiffs clarified that Defendants' alleged misrepresentations induced them to enter into the Operating Agreement, as opposed to the other contemporaneous documents.[173] In response, Defendants cite several provisions in the Purchase Agreement, which they claim amount to an anti-reliance clause that colors Plaintiffs' entry into the Operating Agreement.[174]

Whatever that language's effect, it does not impact the Operating Agreement, which contains a clear integration clause:

---

[172] *See* FAC ¶ 329. Plaintiffs' allegation that the financial presentations were "jointly prepared" fares no better in the face of Plaintiffs' specific allegation that he only spoke with Efros. *See id.* ¶¶ 282, 301.

[173] *See* Hr'g Tr. 54:20–55:13. Readers who have made it this far may recall that Plaintiffs voluntarily dismissed any claims "based on or arising from" any agreement other than the Operating Agreement. *See* D.I. 105.

[174] *See* D.I. 77 at 38–40 (citing Purchase Agr. §§ 2.21, 3.3, 5.12). Defendants do not cite any provisions in the Operating Agreement. *See id.* The Purchase Agreement's language is governed by New York law, the application of which the parties did not brief. *See* Purchase Agr. § 5.13.

53

This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith, including, but not limited to, the Prior LLC Agreement (including any provisions therein purporting to survive the termination thereof).[175]

This language plainly states that the Operating Agreement is the parties' "entire agreement" on the subject and that it "supersedes all. . . contemporaneous agreements" the parties made in connection with it, such as the Purchase Agreement. Defendants therefore cannot expand the Operating Agreement's terms by grafting on contemporaneous agreements that it explicitly superseded.[176] In short, the Operating Agreement contains no provision by which Plaintiffs promised that they did not rely on extra-contractual representations when entering into it.[177]

---

[175] Op. Agr. § 17.8.

[176] *See Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 823 (Del. Ch. 2020) ("An integration clause should be interpreted according to its 'plain meaning when its terms are unambiguous.' When a 'subsequent agreement' contains a valid integration clause, it 'supersedes the terms' of any prior agreement covering the same subject matter." (internal citations and alterations omitted) (quoting *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *6 (Del. Ch. Nov. 19, 2013), and also quoting *ESG Cap. P'rs II, LP v. Passport Special Opportunities Master Fund, LP*, 2015 WL 9060982, at *11 (Del. Ch. Dec. 16, 2015))). Had the parties wished to preserve the terms of the Purchase Agreement in face of this clause, they could have done so. *Compare* Op. Agr. § 17.8, *with ev3, Inc. v. Lesh*, 114 A.3d 527, 532 (Del. 2014) (describing an integration clause that carved out one of the parties' prior agreements).

[177] The integration clause itself falls well short of the type of clear anti-reliance language required by Delaware courts to bar a fraud claim. *See, e.g.*, *Abry P'rs*, 891 A.2d at 1059 (noting that "murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations.").

### 3. Counts XIV And XVI State Claims Against Efros.

With the detritus of the thirteen preceding claims behind us, we reach the crux of the parties' dispute: whether Plaintiffs have pled that Efros knowingly made a misrepresentation with the intent to induce Plaintiffs to enter into the Operating Agreement. They have.

This Court's decision in *Clark v. Davenport*[178] is instructive. In *Clark*, the Court sustained a claim for fraud in the face of a motion to dismiss where the plaintiff investor had alleged the defendant CEO had made factual misrepresentations relating to (1) the company's fundraising efforts, (2) the company's future financial prospects, and (3) the company's upcoming strategic partnership with IBM.[179] The Court found that the CEO's statements about the present state of the fundraising process and the IBM partnership "described the current state of [the company's] relationships with its investors and with IBM," and were thus actionable misrepresentations for the purposes of the investor's fraud claim.[180] As for the defendant's statements about the company's future projections, the Court found:

> The statements about [the company's] future prospects were forward-looking, but that did not mean [the CEO] could say anything he wanted. So long as a party acts in good faith, errors in estimates or mistaken predictions about future success will not be sufficient to support a fraud

---

[178] 2019 WL 3230928 (Del. Ch. July 18, 2019).

[179] *See id.* at *11–13.

[180] *See id.* at *12.

claim. "On the other hand, when a party makes false statements with an intent to deceive, that party may be liable for fraud regardless of whether the statements expressed opinions, estimates, or projections of the future." [CEO's] conduct supports an inference that he intended to deceive [the investor], rendering his statements actionable at the pleading stage.[181]

Based on these alleged misrepresentations, the Court denied the defendants' motion to dismiss.[182]

This case involves similar allegations, particularly with respect to Efros' representations about the Potential Merger Agreement and AGR's finances.[183] Efros presented the Distribution Merger to Menashe not as a speculative opportunity, but as a transaction he was currently negotiating.[184] In other words, he described the "current state"[185] of AGR's negotiations with the distribution company, and suggested that a deal was imminent. The Distribution Merger was purportedly so close to being finalized that the parties carved it out of the Investment Banking

---

[181] *Id.* at *12 (quoting *In re Genesis Health Ventures, Inc.*, 355 B.R. 438, 458 (Bankr. D. Del. 2006)).

[182] *See id.* at *13.

[183] Like the plaintiffs in *Clark*, Plaintiffs make general allegations about the state of AGR's financing efforts, but these allegations were not plead with particularity and did not describe "the current state" of AGR's relationships with investors. *Compare* FAC ¶¶ 83, 96, *with Clark,* 2019 WL 3230928, at *11–12 (describing factual claims about the company's fundraising efforts).

[184] *See* FAC ¶ 61.

[185] *See Clark*, 2019 WL 3230928, at *12.

Agreement.[186]   After the Investment, the deal vanished without warning or explanation, and it was never spoken of again.[187]   There are different inferences to be drawn from these facts; the reasonable inference in Plaintiffs' favor is that Efros purposefully misstated the present state of the Distribution Merger's negotiations. This is an actionable misrepresentation for the purposes of a fraud claim.[188]

Plaintiffs also point to AGR's historical financial data, which Efros presented to Menashe on June 1, in advance of the Investment.[189]   These historical numbers were representations of fact.   Plaintiffs plead these numbers were inaccurate, as evidenced by the adjustment to them in July.[190]   Plaintiffs allege that Efros knew this data was false,[191] especially given that they were prepared by Roach.[192]   And contrary to Defendants' arguments, Plaintiffs plead reliance on these representations.[193]

---

[186] *See* Investment Banking Agr. 1; *see also* FAC ¶ 61.

[187] *See* FAC ¶ 48 & n.6; *see also id.* ¶ 61.

[188] *See Clark*, 2019 WL 3230928, at *12.

[189] *See* FAC ¶¶ 48, 123.

[190] *See id.* ¶ 5.

[191] *See id.* ¶ 317.

[192] *See id.* ¶¶ 86, 89.

[193] *See id.* ¶ 4 ("Menashe decided on AGR as a personal investment relying upon the historical financials and projections made by the Defendants.").

As for AGR's financial projections, the circumstances surrounding them suggest that they were formulated with the intent to deceive.[194] Generally speaking, "[p]redictions about the future cannot give rise to actionable common law fraud. Nor can expressions of opinion."[195] An exception to that rule applies when plaintiffs can establish that the projections were "unsound from the inception."[196]

> What is necessary is the pleading of facts suggesting that the original estimates were fraudulently conceived, from the get-go. This does not require a plaintiff to probe the mindset of the defendants, what it does require is that the plaintiff set forth particularized facts regarding the precise estimates in question, the circumstances suggesting they were unsound from the inception, and why the defendants had an incentive to intentionally low-ball them.[197]

Several facts suggest that the projections Efros provided Menashe were unsound from their inception. To the extent the projections were based on AGR's past financial performance, those numbers were fraudulent, as described above. Moreover, these projections were based on a model developed and operated by

---

[194] *See Clark*, 2019 WL 3230928, at *12.

[195] *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001); *see Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 208–09 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 2005 WL 5757652, at *12 (Del. Ch. Apr. 1, 2005) ("The law has always been skeptical about grounding fraud claims in projections of future events for the obvious reason that the fact that a prediction might not come true does not mean the projection was not made in good faith and also because it is unreasonable to place much weight on such statements.").

[196] *See Trenwick*, 906 A.2d at 209.

[197] *Id.*

Roach,[198] who only months later would plead guilty to preparing fraudulent financial statements to trick investors as part of a Ponzi scheme.[199] Efros kept the model from Menashe during negotiations, insisting that only Roach understood it.[200] And Efros allegedly knew about the investigation into Roach at this time.[201] The dubiousness of the model's input, the model's output, and the model's operator all suggest that AGR's projections were unsound from their inception, and may have been fraudulently conceived. It is reasonable at this stage to infer that Efros presented these projections to Menashe with the intent to deceive him.

Taken together, Plaintiffs' allegations in Counts XIV and XVI state claims for fraud.[202] And so, the Motion is denied with respect to those counts.[203]

---

[198] *See* FAC ¶¶ 91, 106 & n.11.

[199] *See id.* ¶¶ 6, 90.

[200] *See id.* ¶¶ 91, 106 & n.11.

[201] *See id.* ¶ 6. Defendants dispute whether the investigation into Roach was "knowable" to Efros, citing the fact that charges against Roach were not filed until October 2019. Plaintiffs allege that Efros was aware of the investigation in advance of the charges, given that Efros told Menashe Roach was in some trouble in August 2019. *See id.* ¶ 88. It is reasonable to infer, based on this fact, that Efros knew about the investigation while the parties were negotiating the Investment, as Plaintiffs allege.

[202] In briefing, the parties did not distinguish between Plaintiffs "fraud and concealment" claims and its "fraudulent inducement" claims. *See* D.I. 77 at 33–42; D.I. 106 at 33–46; D.I. 108 at 19–28. Because Defendants have not provided an independent basis to dismiss either Count XIV or XVI, the Motion is denied with respect to both counts.

[203] Defendants also argue that Menashe does not have standing to pursue a fraud claim, since DG BF, not Menashe, invested in AGR. This argument fails to compel dismissal of any of the fraud claims, since DG BF is also a plaintiff on those claims. *See* FAC at 110, 115, 119, 122.

## G. Count XVIII: Defamation

Count XVIII, pled against all Defendants, alleges that Ray and Efros, "ostensibly acting on behalf of AGR, made false representations [about Menashe] to the Series D [Unitholders]."[204] Menashe claims that these statements defamed him, causing his reputation to suffer and, ultimately, causing him to lose his position as the Series D Manager.[205]

I first note a preliminary matter that the parties did not raise. "The Court of Chancery is proudly a court of limited jurisdiction."[206] "Equitable jurisdiction is a predicate issue for every matter in this court of limited jurisdiction."[207] The Court has a duty to determine whether it has the jurisdiction to hear Plaintiffs' claim and can raise the jurisdictional issue *sua sponte*.[208] An independent claim for defamation does not fall within the purview of Chancery's equitable jurisdiction because "*equity*

---

[204] *Id.* ¶ 336.

[205] *See id.* ¶¶ 337–38.

[206] *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *4 (Del. Ch. June 27, 2019).

[207] *Preston Hollow Cap., LLC v. Nuveen, LLC* (*Preston Hollow I*), 2019 WL 3801471, at *4 (Del. Ch. Aug. 13, 2019) (citing *Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2019 WL 3451376 (Del. Ch. July 31, 2019)).

[208] *See, e.g.*, Ct. Ch. R. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the Court lacks jurisdiction of the subject matter, the Court shall dismiss the action."); *Envo, Inc. v. Walters*, 2009 WL 5173807, at *4 n.10 (Del. Ch. Dec. 30, 2009) ("The issue of subject matter jurisdiction is so crucial that it may be raised at any time before final judgment and by the court *sua sponte*."), *aff'd*, 2013 WL 1283533 (Del. Mar. 28, 2013) (TABLE).

*will not enjoin a libel.*"[209] In view of this Court's limited ability to redress common-law torts, as well as this Court's inability to sanction a party solely for speech, defamation, and specifically its subcategories of libel and slander, "are seen as denizens of the Superior Court, and are subject to the findings made there by juries regarding the speech of their peers."[210]

The parties have not briefed the question of whether this Court has subject matter jurisdiction over Plaintiffs' defamation claim, which seeks damages but not injunctive relief. Given these weighty jurisdictional concerns, I will hold my consideration of Count XVIII in abeyance pending the submission of supplemental briefing on this issue. In an effort to make those briefs more useful, I direct the parties to *Laser Tone Business Systems, LLC v. Delaware Micro-Computer LLC*,[211] where this Court exercised its cleanup jurisdiction over a compulsory counterclaim for defamation and awarded damages post-trial.[212] The parties' supplemental submissions should address whether a similar approach is warranted here, where the Court has equitable and cleanup jurisdiction over other claims, but the defamation claim is not compulsory.

---

[209] *Preston Hollow I*, 2019 WL 3801471, at *9 (interpreting *J.C. Pitman & Sons, Inc. v. Pitman*, 7 A.2d 721 (Del. Ch. 1946)); *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 115 (Del. Ch. 2017).

[210] *Preston Hollow I*, 2019 WL 3801471, at *1.

[211] 2019 WL 6726305 (Del. Ch. Nov. 27, 2019).

[212] *See id.* at *15 n.177 (compiling authorities).

The parties should also consider this Court's reasoning in *Perlman v. Vox Media, Inc.*:

> [F]ollowing this court's scholarly and thoughtful Opinion in *Organovo H*[*oldings*]*., Inc. v. Dimitrov*, I conclude that, in connection with a claim for defamation, the Court of Chancery, in all instances, lacks subject matter jurisdiction to adjudicate the questions of whether a defendant made a false statement about the plaintiff and whether it did so with actual malice. A defendant alleged to have committed the tort of defamation is entitled, should she wish, to have a jury decide those threshold questions. [213]

If Defendants wish to make a similar election in this case, they should raise the issue in their supplemental submission.

The Motion remains under advisement with respect to Count XVIII.

### H.  Count XXII:  Section 18-110

Count XXII seeks a declaration under Section 18-110 that Menashe was not validly removed from his office as Series D Manager.[214]  First, Defendants argue that this claim is procedurally deficient because Plaintiffs fail to name the company as a defendant in Count XXII.  Because Section 18-110 proceedings are *in rem*, the

---

[213] *Perlman*, 2019 WL 2647520, at *1.

[214] *See* 6 *Del. C.* § 18-110(a) ("Upon application of any member or manager, the Court of Chancery may hear and determine the validity of any . . . removal . . . of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may determine the person or persons entitled to serve as managers . . . .").

statute requires the company to be a party to the case.[215]  Count XXII is pled against "all Defendants" and AGR is named as a nominal defendant, so dismissal is inappropriate on those grounds.

Turning to the substance of the claim, Defendants argue that Menashe's removal and the Written Consents were executed in compliance with Section 5.3(b)(i) of the Operating Agreement, so Plaintiffs cannot prevail.  But Plaintiffs have alleged that the Written Consents' representation that "the undersigned Series D Members constitute a majority of the Series D shareholders" is false.[216]  If less than 50% of the Series D shareholders voted to remove Menashe, then it is reasonably conceivable that the vote was invalid under Section 5.3(b)(i).[217]

Moreover, technical compliance with the Operating Agreement's removal procedures does not foreclose Plaintiffs' claim.  As the Delaware Supreme Court famously recognized in *Schnell v. Chris-Craft Industries*, "inequitable action does not become permissible simply because it is legally possible."[218]  "Corporate acts

---

[215] *See* 6 *Del. C.* § 18-110(a); *see also Lynch v. Gonzalez*, 2020 WL 5648567, at *5 (Del. Ch. Sept. 22, 2020).

[216] *See* FAC ¶ 143 ("Moreover, in a July 7, 2020 consent form, Defendants made representations to the shareholders that, on information and belief, were false.  First, as aforementioned, they represented that the undersigned Series D Members constitute a majority of the Series D shareholders.").

[217] *See* Op. Agr. § 5.3(b)(i) (providing that the Series D Manager "may be removed during his or her term of office, with or without cause, by and only by the affirmative vote or written consent of that Person or Persons which have the power to appoint that Manager.").

[218] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).

63

thus must be 'twice-tested'—once by the law and again by equity."[219] This Court

has applied *Schnell* in Title 8, Section 225 proceedings, the corporate analogue to

Section 18-110:

> If Section 225 demanded only technical compliance with statutory
> consent requirements, then I would grant [defendant's] Motion. But
> this Court has applied *Schnell*'s equitable principles in Section 225
> actions. . . . Courts weighing claims under Section 225 must consider
> cognizable allegations of fraud, deceit, breach of contract, breach of
> fiduciary duty, and other claims that "if meritorious, would help the
> court decide the proper composition of the corporation's board or
> management team." As a result, the Court must review issues that
> could infect the composition of a company's "de jure directors and
> officers" under Section 225, notwithstanding formal compliance with
> the voting procedures and requirements for those offices.[220]

These principles apply with equal force in a Section 18-110 proceeding.[221]

Here, Defendants' alleged misconduct surrounding the Written Consents

prevents the Court from dismissing Count XXII. Plaintiffs allege that, in retaliation

for his initial complaint in this case, Defendants orchestrated a "scheme to remove

Menashe from his role as Series D Manager" and replace him with "a more malleable

'ally.'"[222] According to Plaintiffs, that scheme involved a secretive process by which

---

[219] *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007).

[220] *Brown v. Kellar*, 2018 WL 6721263, at *6–7 (Del. Ch. Dec. 21, 2018); *see also Bäcker v. Palisades Growth Cap. II, L.P.*, 2021 WL 140921, at *10 (Del. Jan. 15, 2021).

[221] *See, e.g.*, *Pharmalytica Servs., LLC v. Agno Pharm., LLC*, 2008 WL 2721742, at *3 & n.6 (Del. Ch. July 9, 2008) (describing Section 18-110 as "the limited liability company companion to 8 *Del. C.* § 225" and applying Section 225 jurisprudence by analogy).

[222] *See* FAC ¶¶ 138–39.

Efros tricked the Series D Unitholders into executing the Written Consents by misrepresenting Menashe's support among the other unitholders.[223]  All the while, Menashe was in the dark and had no opportunity to defend himself or even vote his substantial block of shares.[224]  At this stage, it is reasonably conceivable that, when twice-tested, the Individual Defendants' inequitable conduct in removing Menashe would overcome the Written Consents.[225]  And so, with respect to Count XXII, the Motion is denied.

Consistent with the summary nature of Section 18-110 proceedings, the proper course may be to stay consideration of Plaintiffs' surviving claims, the facts of which are more sweeping, and which precede the facts underlying this claim, pending a summary resolution of Count XXII.[226]  This issue was not discussed in briefing.  The parties shall confer on whether such bifurcation would be appropriate.

---

[223] *See id.* ¶ 140.

[224] *See id.* ¶ 142.

[225] *See Brown*, 2018 WL 6721263, at *6–7.

[226] *Cf. Box v. Box*, 697 A.2d 395, 398 (Del. 1997) ("The purpose of section 225 is to provide a quick method for review of the corporate election process to prevent a Delaware corporation from being immobilized by controversies about whether a given officer or director is properly holding office.  To preserve an expedited remedy, a proceeding brought pursuant to section 225 is a summary proceeding, and the Court of Chancery has consistently limited section 225 trials to narrow issues.  Thus, a section 225 action is not to be used for trying purely collateral issues, issues of director misconduct or other breaches of duty." (footnotes omitted)).

If the parties cannot agree on a path forward, they may present their positions in their supplemental submissions regarding Count XVIII.

## I. Count XXIII: Piercing The Corporate Veil/Alter Ego

Count XXIII alleges that AGR is the Individual Defendants' alter ego and seeks to pierce the corporate veil. "It should be noted at the outset that persuading a Delaware Court to disregard the [corporate] entity is a difficult task."[227] Doing so under an alter ego theory "requires that the corporate structure cause fraud or similar injustice."[228] "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."[229] At the pleading stage,

> [Plaintiffs] must allege facts that, if taken as true, demonstrate the Officers' and/or the Parents' complete domination and control of the [company]. The degree of control required to pierce the veil is "exclusive domination and control to the point that the [company] no longer has legal or independent significance of its own."[230]

"Although a court considers several factors when determining whether to pierce the corporate veil, courts have often articulated the elements of a veil piercing as

---

[227] *Harco Nat. Ins. Co. v. Green Farms. Inc.*, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989).

[228] *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996).

[229] *Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

[230] *Wallace*, 752 A.2d at 1184 (footnotes and alterations omitted) (quoting *Hart Hldg. Co. Inc. v. Drexel Burnham Lambert Inc.*, 1992 WL 127567, at *11 (Del. Ch. May 28, 1992)).

requiring 'an overall element of injustice or unfairness.'"[231] "Most importantly, because Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence."[232]

The Amended Complaint falls well short of pleading a claim under this theory. There are no allegations that support an inference that AGR is a "sham" or that it "exist[s] for no other purpose than as a vehicle for fraud."[233] To the contrary, Plaintiffs describe AGR as "a multi-million-dollar cannabis and CBD business that is a top 10 Cannabis brand in California."[234] AGR owns several subsidiaries that operate as Bloom Farms, which the Amended Complaint describes as a "business active."[235] Plaintiffs' limited allegations "on information and belief" that AGR is undercapitalized or is being used as the Individual Defendants' "personal piggy

---

[231] *Paul Elton, LLC v. Rommel Del., LLC*, 2020 WL 2203708, at *14 (Del. Ch. May 7, 2020) (quoting *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015)).

[232] *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010).

[233] *See Wallace*, 752 A.2d at 1184.

[234] FAC ¶ 1.

[235] *See id.* ¶¶ 21, 41–42.

banks" are not well pled.[236]  Plaintiffs "must do more than plead that [AGR] is the [the Individual Defendants'] alter ego . . . in conclusory fashion in order for the Court to disregard their separate legal existence."[237]  With respect to Count XXIII, the Motion is granted.

### J.     Counts XII, XIII, And XXI:  The Series E Offering

The parties agree that Counts XII, XIII, and XXI were mooted by the Court's previous decisions regarding the Series E Financing.[238]  Based on the parties' mutual agreement, these claims are dismissed.

### K.     Plaintiffs' Other Requests For Relief Fail Or Are Otherwise Improperly Presented As Causes Of Action.

Several counts of the Amended Complaint request punitive damages. Plaintiffs have acknowledged that this request is improper.[239]  Count XXIV requests an "equitable accounting."  Insofar that Count XXIV alleges a standalone cause of action, it fails to state a claim because equitable accounting is a remedy, not a cause of action.  In any case, Plaintiffs' entitlement to an equitable accounting as a remedy for its other claims must be evaluated at a later stage.

---

[236] *See id.* ¶ 128 ("On information and belief, Ray and Efros had been treating AGR as no more than a facade, undercapitalizing AGR, keeping it insolvent by siphoning its funds while failing to follow basic corporate formalities, commingling funds with AGR and using the Company as their personal piggy banks.").

[237] *See MicroStrategy*, 2010 WL 5550455, at *11.

[238] *See* D.I. 106 at 26 n.12; D.I. 77 at 31–33, 49; *see also* Hr'g Tr. 5:1–3.

[239] *See* D.I. 106 at 26 n.12.

## III.   CONCLUSION

For the foregoing reasons, the Motion is **GRANTED** in part and **DENIED** in part.  The Motion is granted with respect to the claims in Counts I, II, III, IV, VI, VIII, IX, XI, XII, XIII, XV, XVII, XIX, XX, XXI, XXIII, and XXIV.  The Motion is granted in part with respect to the claims in Count V, except with respect to the allegation in paragraph 207(e), for which the Motion is denied.  The Motion is also denied with respect to the claims in Counts VII, X, XIV, XVI, and XXII.  In short, Plaintiffs may proceed on all of their breach of contract claims against AGR and its Board; a single contract claim and implied covenant claim against Ray with regard to the selection of the Independent Manager; their fraud theories against Efros; and their declaratory judgment claim under Section 18-110.

The Motion remains under advisement with respect to Count XVIII, for defamation, pending the parties' supplemental submissions.  The parties shall confer on a supplemental briefing schedule for those issues.  The parties shall also confer on whether the Court should stay consideration of the Amended Complaint's surviving counts pending resolution of Plaintiffs' Section 18-110 claim in Count XXII. If the parties cannot agree on a schedule, they may include a brief discussion of this issue in their supplemental submissions regarding Count XVIII.   An implementing order will follow consideration of Count XVIII and potential bifurcation.